**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                          3:11-cr-216-J-34MCR

DEBORAH M. TOWNSEND
_____

# REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress (Doc. 18) filed September 16, 2011. The Government filed a response in opposition to the Motion on October 24, 2011 (Doc. 27). An evidentiary hearing was held before the undersigned on November 2, 2011.

## I. Evidence Presented at the Hearing

During the hearing, the Government presented the testimony of two agents, Investigators Mervyn Miller and Bruce Duke with the Office of the Inspector General for the Social Security Administration. Agent Miller was the lead agent assigned to Defendant Deborah Townsend's work concealment case. According to Agent Miller, Defendant was informed via letter that her social security benefits were suspended until she came in to the social security office for an interview to discuss her alleged work

---

[1] Any party may file and serve specific, written objections hereto within FOURTEEN (14) DAYS after service of this Report and Recommendation. Failure to do so shall bar the party from a de novo determination by a district judge of an issue covered herein and from attacking factual findings on appeal. See 28 U.S.C. § 636(b)(1); Rule 72(b), Fed.R.Civ.P.; and Local Rule 6.02(a), United States District Court for the Middle District of Florida.

concealment. (Tr. 10:17-25).[2] When Defendant failed to show up for her scheduled interview, a claims representative contacted her and she informed him that she could not come in because she was ill. (Tr. 10:7-11, 11:9-10). The claims representative then contacted Agent Miller and asked that he set up an appointment to meet with Defendant at her residence. (Tr. 10:13-16). Agent Miller contacted Defendant and coordinated a convenient time for them to meet. (Tr. 11:19-22).

On May 5, 2011, the date of the scheduled interview, Agent Miller contacted Defendant to make sure it was still okay for him to come to her residence. Defendant stated that it was and gave him instructions on how to locate her apartment. (Tr. 12:13-24). Agent Duke accompanied Agent Miller to the interview.[3] (Tr. 14:11-12). Upon arrival, the agents were introduced to Defendant's mother, who was present for the entire interview. (Tr. 13:21-25, 14:1; 69:22-24). The two agents, Defendant, and her mother sat around the kitchen table in Defendant's apartment with the front door open. (Tr. 14:2-3, 17:22).

At the time of the interview the agents knew that Defendant suffered from rheumatoid arthritis (the reason she received disability benefits) but were unaware of any other medical conditions. (Tr. 15:17-24; 83:2-3). The agents testified that Defendant did not appear ill but may have sneezed or blown her nose during the course of the interview. (Tr: 15:8-12; 70:21-25). Additionally, the agents testified that they

---

[2] References to the transcript of the evidentiary hearing conducted on September 19, 2011, will be "Tr. Page number : line number(s)."

[3] According to Agent Duke, it is protocol for two agents to be present during this type of interview. (Tr. 67:6-23).

were unaware of any medications Defendant was taking as she did not appear to be impaired in any way.[4]  (Tr. 16:7-14, 71:16-20).

Agent Miller testified that at the beginning of the interview he informed Defendant that the interview was voluntary and she was free to stop the questioning any time, then he proceeded to question Defendant about her alleged unreported work activity.  (Tr. 14:19-25, 19:15-21, 70:6-11).  Defendant was completely cooperative during the questioning.  (Tr. 19:22-24; 74:7-16).  After some discussion, Agent Miller asked Defendant if she would be willing to provide a written statement and she agreed.[5]  (Tr. 25:18-20).  According to Agent Miller, after drafting the statement, he read it aloud to Defendant and then gave it to her to read on her own.  (Tr. 27:14-18, 78:3-11).  She initialed each page as she read.  (Tr. 28:20-22); see also (Gov. Ex. 1).  Agent Miller testified that he then asked Defendant to read the last sentence of the statement aloud, "I have read this statement consisting of this and two other pages," which she did.[6]  (Tr. 28:24).  Then, Defendant swore to the statement and signed it.  (Tr. 29:2-3).

After the statement was signed, Agent Miller informed Defendant that the agency would prepare a report and present it to the U.S. Attorney's Office regarding prosecution, then the agents left.  (Tr. 32:6-10).  According to Agent Duke, the interview lasted approximately an hour.  (Tr. 75:17).

---

[4] The agents testified that it is only customary to inquire about medication usage if the interviewee seems impaired in some way.  (Tr. 44:19-22; 81:2-9).

[5] Said written statement was entered into evidence as Government's Exhibit 1.

[6] Agent Miller testified that he always has the individual read this sentence aloud to demonstrate that they have the capacity to read and comprehend. (Tr. 28:22-24).

After the interview and prior to Defendant's indictment, Defendant contacted Agent Miller to inform him that she had the original earning and wage statements that she had provided the agents with copies of during the interview. With Defendant's permission, Agent Miller picked up the documents at Defendant's parent's home, where she was living. (Tr. 34:1-5). Once the indictment was returned, Agent Miller called Defendant to set up a time for him to pick her up for arrest. (Tr. 35:1-4). The arrest was amicable. (Tr. 36:20).

After the Government presented the testimony of Agents Miller and Duke, the defense presented the testimony of Defendant's mother, Janet Hogan. Ms. Hogan's testimony regarding the events that occurred at Defendant's residence on May 5, 2011 was dramatically different than that of the agents. According to Ms. Hogan, Defendant was suffering from an obvious fever and flu-like symptoms on the date of the interview. (Tr. 95:15). Defendant's medication, combined with her illness, caused her to be confused and unable to effectively communicate with the agents.[7] (Tr. 123:9-15). Ms. Hogan claims that the agents were aware of Plaintiff's medication impairments as well as her illness.[8] (Tr. 102:16-18).

Ms. Hogan testified that during the course of the interview, Agent Duke was constantly yelling and mistreating Defendant. (Tr. 107:4-13). When Defendant stated

---

[7]Ms. Hogan testified that Defendant had taken the following medications on the date of the interview: Decadron which is a steroid, Phenergan for nausea, Celebrex for inflammation, Xanex for pain and nerves, and Percocet for pain. (Tr. 98:8-16, 123:7).

[8]This allegation is denied by both Agent Miller and Agent Duke, who testified that Defendant did not appear ill or to be suffering from medication side effects. To the contrary, Defendant appeared alert and coherent. (Tr. 58:10-20; 145:13-25, 146:1).

that she needed an attorney, Agent Duke informed her that she could not afford one and would have to proceed with the interview.[9] (Tr. 101:14-16). According to Ms. Hogan, Agent Duke stated that if Defendant refused to cooperate he would return and arrest her on a Friday, in a "brash, full-force fashion," and Defendant would be denied her medications until she saw a judge the following Monday.[10] (Tr. 103:13-22, 104:7-9). According to Ms. Hogan, Agent Duke's threats, combined with Defendant's illness and medication usage, caused her daughter to be improperly coerced into signing the written statement.

## II. Discussion

Defendant seeks to suppress her written statement as involuntary. (Doc. 18). Specifically, Defendant claims her statements were involuntary because:

> (1) She "suffers from a number of serious medical conditions of which the agents were aware," she "takes a number of medications, some of which affect her ability to reason and impair her faculties," and "[o]n the date of the interrogation, the Defendant was ill and running a 102 degree fever," a condition that she claims the agents were made aware of;
>
> (2) The agents were "verbally aggressive" with her and this "hostility was particularly influential due to the Defendant's fragile physical state"; and
>
> (3) she was "advised that if she did not sign the statement, that the Agents would intentionally return on a Friday, in a brash, full-force fashion, and that the Defendant would be

---

[9] This allegation is denied by both Agent Miller and Agent Duke. (Tr. 58:10-20; 145:13-25, 146:1).

[10] This allegation is denied by both Agent Miller and Agent Duke. (Tr. 30:16-25, 31:1-6, 146:6-10).

>           denied the medications that she depends on until she saw a
>           judge the following Monday."

See (Doc. 18, pp. 1-2). The Government responds that Defendant's allegations are "outrageous" and "not true"; therefore, Defendant's Motion to Suppress should be denied. See (Doc. 27, p. 2).

## A.     Credibility Analysis

The testimony of Agents Miller and Duke heavily conflicts with the testimony of Ms. Hogan; thus, the Court will perform a credibility analysis. When weighing the credibility of witnesses, the Court does not look at the status of the witness; rather, the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand, and the witnesses' interest in the outcome of the hearing. United States v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002).

After hearing the testimony, the Court finds Agents Miller and Duke's testimony to be more credible. While on the stand, Agents Miller and Duke's demeanor was forthright and calm. Ms. Hogan was somewhat calm but seemed edgy and defensive. Ms. Hogan has a vested interest in the outcome of the hearing, specifically her daughter's liberty.

Agents Miller and Duke's testimony was consistent with one another; however, Ms. Hogan recollection of the events that occurred at Defendant's residence on May 5, 2011 was entirely different. With regard to Defendant's medical condition and medication side effects, Ms. Hogan testified that the agents knew Plaintiff was ill and

taking various medications which were effecting her ability to understand the nature of the interview. (Tr. 102:9-18). This allegation is denied by both Agent Miller and Agent Duke, who testified that Defendant did not appear ill or to be suffering from medication side effects. To the contrary, the agents testified that Defendant was alert and coherent. (Tr. 58:10-20; 145:13-25, 146:1). Indeed, Agent Miller called Defendant before their meeting on May 5, 2011 and she made no indication that she was to sick or unable to meet with the agents. (Tr. 12:13-24).

Ms. Hogan testified that Defendant told the agents that she may need an attorney and Agent Duke responded by telling her that she could not afford one. (Tr. 101:12-16). This allegation is also denied by both Agent Miller and Agent Duke. (Tr. 58:10-20; 145:13-25, 146:1). Ms. Hogan further testified that Agent Duke threatened Defendant that if she did not cooperate, that the agents would return and arrest her on a Friday, in a "brash, full-force fashion," and that Defendant would be denied her medications until she saw a judge the following Monday. (Tr. 103:15-21). Again, this allegation is denied by both Agent Miller and Agent Duke. (Tr. 30:16-25, 31:1-6, 146:6-10).

If Ms. Hogan's testimony regarding the threats and coercive behavior of Agent Duke is taken as true, one is left to wonder why the interview continued on as long as it did. The front door was left open for the entire interview and neither Defendant nor her mother asked the agents to leave. Additionally, after the interview was over, Defendant reached out to Agent Miller to provide him with additional documentation. (Tr. 34:1-5). Defendant invited him to her parent's home to pick up the documentation and

introduced him to her father while he was there. (Tr. 34:12). This is not the behavior of a woman who was been harassed and mistreated.

Moreover, inconsistencies were present between Defendant's Motion to Suppress Evidence (Doc. 18) and Ms. Hogan's testimony. Defendant's Motion continuously states that *both* agents were verbally aggressive and threatening. See (Doc. 18, pp. 2-3). However, according to Ms. Hogan's testimony, Agent Duke was the only one who acted aggressively and made the inappropriate comments and threats. Indeed, Ms. Hogan testified that it was Agent Duke that conducted the interview and did most of the talking, not Agent Miller. (Tr. 106:12-16). Testimony that conflicts with the factual basis in the Defendant's own Motion clearly brings the credibility of the witness into question. See U.S. v. Dominguez, 2006 WL 1704461, at * 7 (M.D. Fla. June 8, 2006) (finding the witnesses testimony as not credible because it conflicted with the factual basis in the defendant's motion to suppress)

The Court further notes that both agents have been criminal investigators with the Office of the Inspector General for the Social Security Administration for well over ten years. (Tr. 6:18-21, 63:24-25, 64:1-3). During Agent Miller's law enforcement career, there has never been a case where a defendant has moved to suppress a statement that was given to him nor has he been accused of intimidating or harassing a witness.[11] (Tr. 9:19-25, 10:1-2). Similarly, Agent Duke has never been accused of

---

[11] In 1991, Agent Miller began working for the United States Secret Service where he worked for approximately five years. (Tr. 7:8-9). After that, he was transferred to the Food and Drug Administration, Office of Criminal Investigations, where he worked for approximately one year until
(continued...)

intimidating or otherwise coercing a subject or witness during an interview.[12]  (Tr. 64:16-19).

Thus, based on the testimony, the witnesses demeanor in court, and the witnesses interest in the outcome of the hearing, the Court finds the testimony of Agents Miller and Duke to be the more credible.

**B.     Whether Defendant's Statement was Voluntary**

"'The applicable standard for determining whether a confession was voluntarily given is whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice.'"  United States v. Arango, 853 F.2d 818, 824 (11th Cir. 1988) (quoting United States v. Vera, 701 F.2d 1349, 1364 (11th Cir. 1983).  In other words, the court must determine "whether the accused 'made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.'"  United States v. Rouco, 765 F.2d 983, 993 (11th Cir. 1985) (quoting Jurek v. Estelle, 623 F.2d 929, 937 (5th Cir. 1980) (en banc)).  In assessing the totality of the

---

[11](...continued)
resigning for relocation purposes.  (Tr. 7:10-11).  Then, he was employed as the director of police training for the U.S. Navy for three years until beginning work with the Social Security Administration.  (Tr. 8:7:20-25).

[12]In 1970, Agent Duke began his law enforcement career as a criminal investigator with the Internal Revenue Service.  (Tr. 63:10-12).  In 1972, he joined the Florida Department of law enforcement as a special agent.  (Tr. 63:13-14).  In 1975, he was appointed special agent with the U.S. Secret Service where he was employed until retirement in 1996.  (Tr. 63:15-17).  Upon retirement, Agent Duke began working as a criminal investigator for the Social Security Administration.  (Tr. 63:17-18).  The Court notes during the course of Agent Duke's career, one defendant moved to suppress a statement taken by him for an alleged failure to understand his Miranda warnings.  However, that motion was denied.  (Tr. 64:20-25, 65:4-11).

circumstances, the court looks to "both the characteristics of the accused and the details of the interrogation."  Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  The court should "focus on whether the police overreached, considering factors such as 'the "[accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep."'  United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010).

Here, taking the testimony of Agent Miller and Agent Duke to be more credible than that of Ms. Hogan, the totality of the circumstances demonstrates that Defendant's statement was voluntary.  The interview took place in Defendant's own home with the front door open, in the middle of the day, with Defendant's mother in the same room, present for the entire interview.  The questioning was not prolonged and no physical punishment was used.  The agents did not yell at Defendant, loom over her, brandish their weapons, or otherwise act toward her in an intimidating way.  She did not appear ill or otherwise appear to be in any sort of discomfort. To the contrary, she appeared cooperative and coherent.  Agent Miller informed Defendant that the interview was voluntary and that she could stop the questioning at any time.  With this knowledge, she never asked the agents to leave, she answered the agents' questions, and she never said, or even indicated, that she wanted them to stop questioning her.  Finally, Defendant signed and swore to a written statement in which she acknowledged that the statement was "free and voluntary."

For these reasons, Defendant simply cannot demonstrate that the actions of the agents caused her will to be overborne. Her statements to the agents were a product of her free and rational choice and therefore the statements were voluntary.

Accordingly, after due consideration, it is

**RECOMMENDED**:

Defendant's Motion to Suppress (Doc. 18) be **DENIED** in its entirety.

**DONE AND ENTERED** in Chambers in Jacksonville, Florida this  23rd  day of November, 2011.

*Monte C. Richardson*
MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record

Hon. Marcia Morales Howard
United States District Judge